AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
_____ District of Connecticut

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )          Case No.
)
The Premises described in Attachment A )
)

## APPLICATION FOR A SEARCH WARRANT

I, Special Agent Michael Howard, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

located in the _____ District of _____ Connecticut _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

    x  evidence of a crime;

    x  contraband, fruits of crime, or other items illegally possessed;

    ❏  property designed for use, intended for use, or used in committing a crime;

    ❏  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| Title 18, Sections 2, 1343, 1956, 1952, 1349, 1348, 371, Title 15, Sections 78j(b) and 78ff | |

The application is based on these facts:

See attached Affidavit.

    ❏  Continued on the attached sheet.

    ❏  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
        under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Howard, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

s/Holly B. Fitzsimmons

Date: _____November 22, 2010_____

*Judge's signature*

City and state:  Bridgeport, CT

Hon. Holly B. Fitzsimmons,
United States Magistrate Judge
*Printed name and title*

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS
(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES,
AND
(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS
WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE, ALL
LOCATED AT DIAMONDBACK CAPITAL MANAGEMENT, 1 LANDMARK SQUARE, ON
THE 14TH AND 15TH FLOORS, STAMFORD, CONNECTICUT

(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING

ALL COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR

TELEPHONES: All financial records, handwritten documents and/or

notebooks, letters and correspondence, photographs, telephone and

address books, identification documents, travel documents,

telephone records, computers and other electronic devices,

cellular telephones, and other records and documents that

constitute evidence of the commission of securities fraud, wire

fraud, money laundering, commercial bribery, conspiracy to commit

and aiding and abetting the commission of such crimes, or are

contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds. These items will

be searched pursuant to the procedure set forth in Attachment B.

ATTACHMENT A
(page 2 of 2)

(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE SET FORTH IN ATTACHMENT B.

ATTACHMENT B
(page 1 of 2)

1.    The Federal Bureau of Investigation ("FBI") will follow
the following procedure with respect to the search of the servers
listed in Attachment A at Diamondback Capital Management.

First, personnel at the FBI will make a mirror image of
all, or as much as feasible and necessary, of the servers at
Diamondback Capital Management.

Second, if Diamondback Capital Management volunteers to
make a mirror image of the servers and (if and only if) the FBI
determines that their assistance is necessary and proper, the FBI
will supervise the process by which all, or as much as feasible
and necessary, of the servers at Diamondback Capital Management
will be imaged.

Third, following completion of the imaging process, the
FBI will designate one or more personnel who will be walled off
from the investigation to conduct the following searches of the
imaged material from the servers:

(1) Search for all emails and documents authored
by, sent to, and/or received from Todd Newman and Jesse Tortora.

(2) Search for all emails and documents with the
following search terms:



(a)
(b)
(c) "my check"
(d) consultant
(e)
(f)
(g) Dell

ATTACHMENT B
(page 2 of 2)

2.    For all other items listed in Attachment A (other than
the servers which is covered by procedure #1 above), the FBI will
search the content in Attachment A for the following information:

1.    Any and all communications between and among Todd
Newman, Jesse Tortora, Sam Adondakis, ███████████████████
███████████████████, and any third-party consultant.

2.    Any and all documents relating to, reflecting,
and/or concerning information about public companies.

3.    Any and all evidence reflecting communications
about trading based on information about public companies.

4.    Any and all other evidence that will assist the
FBI in identifying and/or determining whether other individuals
were involved in providing material, nonpublic information in
violation of fiduciary and other duties of confidentiality and/or
involved in trading based on material, nonpublic information.

5.    Any and all other information reflecting and/or
showing and/or leading to evidence, fruits, and/or
instrumentalities of violations of Title 18, United States Code,
Sections 371, 1343, 1348, 1349, 1952, 1956, Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 18, United
States Code, Section 2 in connection with those offenses.

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION OF      :      FILED UNDER SEAL
THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE PREMISES    :
KNOWN AND DESCRIBED AS THE PREMISES
(A) THE DESK AND WORK AREA OF TODD       :      AFFIDAVIT IN
NEWMAN, INCLUDING ALL COMPUTERS,                SUPPORT OF A
LAPTOPS, HAND-HELD DEVICES, AND          :      SEARCH WARRANT
CELLULAR TELEPHONES, AND
(B) A MIRROR IMAGE OF DIAMONDBACK        :
CAPITAL MANAGEMENT'S SERVERS WHICH WILL
THEN BE SEARCHED USING A SPECIFIC        :
PROCEDURE, ALL LOCATED AT DIAMONDBACK
CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,   :
ON THE 14TH AND 15TH FLOORS, STAMFORD,
CONNECTICUT                              :
- - - - - - - - - - - - - - - - - - - - - - x

Michael Howard, being duly sworn, deposes and says:

1.    I am a Special Agent with the Federal Bureau of

Investigation ("FBI").  Yesterday evening, I obtained a search

warrant for to search THE PREMISES KNOWN AND DESCRIBED AS (A) THE

DESK AND WORK AREA OF TODD NEWMAN, INCLUDING ALL COMPUTERS,

LAPTOPS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES, AND (B) A

MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS WHICH

WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE, ALL LOCATED AT

DIAMONDBACK CAPITAL MANAGEMENT, 1 LANDMARK SQUARE, 15TH FLOOR,

STAMFORD, CONNECTICUT (the "PREMISES").  A true and correct copy

of the search warrant is attached as Exhibit A hereto.

2.    Upon executing the search warrant this morning at

approximately 10:00 a.m. at the offices of Diamondback Capital

Management at 1 Landmark Square in Stamford, Connecticut, I

learned the following.  The office of TODD NEWMAN is not located

on the left-hand side of the office as previously believed based
on statements of a cooperating witness.  Rather, NEWMAN's office
is accessed by turning right after passing through the reception
area, and making another right at the end of the hallway,
NEWMAN's office is then the third office on the left-hand side of
the hallway. In addition, I learned that the company's server is
not located on the 15th floor.  Rather, it is located on the 14th
floor, and is accessed by going down an internal staircase that
is next to the reception on the 15th Floor, then continuing
underneath the reception area, making a right turn at the end of
the hallway, then another right.  The server is located in a
closed room secured by a keypad.

    3.   FBI agents have secured the PREMISES but have not
searched NEWMAN's office or the server.[1]

    4.   The Chief Operating Officer of Diamondback Capital
Management has indicated that he gives consent to search the
PREMISES.

---

[1]    I am advised that one of the agents on the search team
opened one or more desk drawers in TODD NEWMAN's office before
being notified that the FBI would be making further application
to the Court based on the location of NEWMAN's office.  The agent
did not observe any materials while opening these drawers.

2

5.   I make this Affidavit to search the PREMISES, now amended to include the 14th and 15th Floors of the building located at 1 Landmark Square, Stamford, Connecticut. The grounds for this application and my belief that there is probable cause to search the PREMISES are set forth in the attached search warrant, and are incorporate herein by reference.

6.   In order to ensure that agents search only the PREMISES, the FBI will carry out the same searches pursuant to the same procedures outlined in the attached search warrant, including in reference to Attachments A and B thereto, upon authorization of the Court.

7.   Since this criminal investigation is non-public and ongoing, disclosure of the search warrant, this affidavit, and/or this application and the attachments thereto will seriously jeopardize the progress of the investigation. Accordingly, I request that the Court issue an order that the search warrant, this affidavit in support of application for the search warrant, the application for the search warrant, and any attachment thereto be filed under seal until further order of this Court.

<u>CONCLUSION</u>

WHEREFORE, I respectfully request that a search warrant issue, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the PREMISES for the items and information set forth in Attachment A, and following the procedure described

3

in Attachment B, all of which constitute evidence, fruits, and

instrumentalities of violations of the TARGET OFFENSES.

Dated:      November 22, 2010

_____
MICHAEL HOWARD
Special Agent
Federal Bureau of Investigation


SO ORDERED:

s/Holly B. Fitzsimmons
_____
HONORABLE HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT

4

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS
(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES,
AND
(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS
WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE, ALL
LOCATED AT DIAMONDBACK CAPITAL MANAGEMENT, 1 LANDMARK SQUARE, ON
THE 14TH AND 15TH FLOORS, STAMFORD, CONNECTICUT

(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING

ALL COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR

TELEPHONES: All financial records, handwritten documents and/or

notebooks, letters and correspondence, photographs, telephone and

address books, identification documents, travel documents,

telephone records, computers and other electronic devices,

cellular telephones, and other records and documents that

constitute evidence of the commission of securities fraud, wire

fraud, money laundering, commercial bribery, conspiracy to commit

and aiding and abetting the commission of such crimes, or are

contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds.  These items will

be searched pursuant to the procedure set forth in Attachment B.

ATTACHMENT A
(page 2 of 2)

(B)  A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S
SERVERS WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE
SET FORTH IN ATTACHMENT B.

ATTACHMENT B
(page 1 of 2)

1.   The Federal Bureau of Investigation ("FBI") will follow
the following procedure with respect to the search of the servers
listed in Attachment A at Diamondback Capital Management.

First, personnel at the FBI will make a mirror image of
all, or as much as feasible and necessary, of the servers at
Diamondback Capital Management.

Second, if Diamondback Capital Management volunteers to
make a mirror image of the servers and (if and only if) the FBI
determines that their assistance is necessary and proper, the FBI
will supervise the process by which all, or as much as feasible
and necessary, of the servers at Diamondback Capital Management
will be imaged.

Third, following completion of the imaging process, the
FBI will designate one or more personnel who will be walled off
from the investigation to conduct the following searches of the
imaged material from the servers:

(1) Search for all emails and documents authored
by, sent to, and/or received from Todd Newman and Jesse Tortora.

(2) Search for all emails and documents with the
following search terms:



(a)
(b)
(c)  "my check"
(d)  consultant
(e)
(f)
(g)  Dell

ATTACHMENT B
(page 2 of 2)

2.    For all other items listed in Attachment A (other than
the servers which is covered by procedure #1 above), the FBI will
search the content in Attachment A for the following information:

1.    Any and all communications between and among Todd
Newman, Jesse Tortora, Sam Adondakis, ▇▇▇ consultants,
▇▇▇▇▇▇▇▇▇▇▇▇ and any third-party consultant.

2.    Any and all documents relating to, reflecting,
and/or concerning information about public companies.

3.    Any and all evidence reflecting communications
about trading based on information about public companies.

4.    Any and all other evidence that will assist the
FBI in identifying and/or determining whether other individuals
were involved in providing material, nonpublic information in
violation of fiduciary and other duties of confidentiality and/or
involved in trading based on material, nonpublic information.

5.    Any and all other information reflecting and/or
showing and/or leading to evidence, fruits, and/or
instrumentalities of violations of Title 18, United States Code,
Sections 371, 1343, 1348, 1349, 1952, 1956; Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 18, United
States Code, Section 2 in connection with those offenses.

AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
### for the
_____ District of ·Connecticut

In the Matter of the Search of

*(Briefly describe the property to be searched*
*or identify the person by name and address)*

The Premises described in Attachment A

)
)
)
)
)
)

·Case No. _____

## APPLICATION FOR A SEARCH WARRANT

I, Special Agent Michael Howard, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

    See Attachment A.

located in the _____ District of _____ Connecticut _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

    x  evidence of a crime;

    x  contraband, fruits of crime, or other items illegally possessed;

    ☐  property designed for use, intended for use, or used in committing a crime;

    ☐  a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 18, Sections 2, 1343, 1956, 1952, 1349, 1348, 371 , Title 15, Sections 78j(b) and 78ff | |

The application is based on these facts:

See attached Affidavit.

    ☐  Continued on the attached sheet.

    ☐  Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Michael Howard, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:   November 21, 2010

City and state:  Bridgeport, CT

s/Holly B. Fitzsimmons

*Judge's signature*

Hon. Holly B. Fitzsimmons,
United States Magistrate Judge
*Printed name and title*

## EXHIBIT A

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS
(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES,
AND
(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS
WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE, ALL
LOCATED AT DIAMONDBACK CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,
15TH FLOOR, STAMFORD, CONNECTICUT

(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING

ALL COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR

TELEPHONES: All financial records, handwritten documents and/or

notebooks, letters and correspondence, photographs, telephone and

address books, identification documents, travel documents,

telephone records, computers and other electronic devices,

cellular telephones, and other records and documents that

constitute evidence of the commission of securities fraud, wire

fraud, money laundering, commercial bribery, conspiracy to commit

and aiding and abetting the commission of such crimes, or are

contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds.  These items will

be searched pursuant to the procedure set forth in Attachment B.

EXHIBIT A

<u>ATTACHMENT A</u>
(page 2 of 2)

(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE SET FORTH IN ATTACHMENT B.

EXHIBIT A

ATTACHMENT B
(page 1 of 2)

1.   The Federal Bureau of Investigation ("FBI") will follow
the following procedure with respect to the search of the servers
listed in Attachment A at Diamondback Capital Management.

First, personnel at the FBI will make a mirror image of
all, or as much as feasible and necessary, of the servers at
Diamondback Capital Management.

Second, if Diamondback Capital Management volunteers to
make a mirror image of the servers and (if and only if) the FBI
determines that their assistance is necessary and proper, the FBI
will supervise the process by which all, or as much as feasible
and necessary, of the servers at Diamondback Capital Management
will be imaged.

Third, following completion of the imaging process, the
FBI will designate one or more personnel who will be walled off
from the investigation to conduct the following searches of the
imaged material from the servers:

(1) Search for all emails and documents authored
by, sent to, and/or received from Todd Newman and Jesse Tortora.

(2) Search for all emails and documents with the
following search terms:

(a)
(b)
(c) "my check"
(d) consultant
(e)
(f)
(g) Dell
(h)
(i)



EXHIBIT A

ATTACHMENT B
(page 2 of 2)

2.    For all other items listed in Attachment A (other than the servers which is covered by procedure #1 above), the FBI will search the content in Attachment A for the following information:

1.    Any and all communications between and among Todd Newman, Jesse Tortora, Sam Adondakis, ▮▮▮▮consultants, ▮▮▮▮ and any third-party consultant.

2.    Any and all documents relating to, reflecting, and/or concerning information about public companies.

3.    Any and all evidence reflecting communications about trading based on information about public companies.

4.    Any and all other evidence that will assist the FBI in identifying and/or determining whether other individuals were involved in providing material, nonpublic information in violation of fiduciary and other duties of confidentiality and/or involved in trading based on material, nonpublic information.

5.    Any and all other information reflecting and/or showing and/or leading to evidence, fruits, and/or instrumentalities of violations of Title 18, United States Code, Sections 371, 1343, 1348, 1349, 1952, 1956, Title 15, United States Code, Sections 78j(b) and 78ff, and Title 18, United States Code, Section 2 in connection with those offenses.

EXHIBIT A

AO 93 (Rev. 12/09) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

### for the
### District of Connecticut

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )     Case No.
)
(A) The Premises described in Attachment A hereto )
)

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ District of _____ Connecticut
*(identify the person or describe the property to be searched and give its location):*
See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:
See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.

**YOU ARE COMMANDED** to execute this warrant on or before _____ November 29, 2010 _____
                                                                                                                                              *(not to exceed 14 days)*
☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been
                                                                                    . established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge
Hon. Holly B. Fitzsimmons _____ .
          *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for ____ . days *(not to exceed 30).*

☐ until, the facts justifying, the later specific date of _____ .

                                                                            s/Holly B. Fitzsimmons
Date and time issued:  11-21-2010    10:34 pm                    _____
                                                                                *Judge's signature*

City and state:  Bridgeport, CT _____          Hon. Holly B. Fitzsimmons, United States Magistrate Judge
                                                                            *Printed name and title*

# EXHIBIT A

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| Certification |
|---|
| I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge. |

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

EXHIBIT A

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS
(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES,
AND
(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS
WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE, ALL
LOCATED AT DIAMONDBACK CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,
15TH FLOOR, STAMFORD, CONNECTICUT

(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING

ALL COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR

TELEPHONES: All financial records, handwritten documents and/or

notebooks, letters and correspondence, photographs, telephone and

address books, identification documents, travel documents,

telephone records, computers and other electronic devices,

cellular telephones, and other records and documents that

constitute evidence of the commission of securities fraud, wire

fraud, money laundering, commercial bribery, conspiracy to commit

and aiding and abetting the commission of such crimes, or are

contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds.  These items will

be searched pursuant to the procedure set forth in Attachment B.

EXHIBIT A

ATTACHMENT A
(page 2 of 2)

(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S

SERVERS WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE

SET FORTH IN ATTACHMENT B.

11-24-2010

EXHIBIT A

ATTACHMENT B
(page 1 of 2)

1.    The Federal Bureau of Investigation ("FBI") will follow
the following procedure with respect to the search of the servers
listed in Attachment A at Diamondback Capital Management.

First, personnel at the FBI will make a mirror image of
all, or as much as feasible and necessary, of the servers at
Diamondback Capital Management.

Second, if Diamondback Capital Management volunteers to
make a mirror image of the servers and (if and only if) the FBI
determines that their assistance is necessary and proper, the FBI
will supervise the process by which all, or as much as feasible
and necessary, of the servers at Diamondback Capital Management
will be imaged.

Third, following completion of the imaging process, the
FBI will designate one or more personnel who will be walled off
from the investigation to conduct the following searches of the
imaged material from the servers:

(1) Search for all emails and documents authored
by, sent to, and/or received from Todd Newman and Jesse Tortora.

(2) Search for all emails and documents with the
following search terms:



(a)
(b)
(c) "my check"
(d) consultant
(e)
(f)
(g) Dell
(h)
(i)

11-21-2010

EXHIBIT A

ATTACHMENT B
(page 2 of 2)

2.    For all other items listed in Attachment A (other than
the servers which is covered by procedure #1 above), the FBI will
search the content in Attachment A for the following information:

1.    Any and all communications between and among Todd
Newman, Jesse Tortora, Sam Adondakis, ████████consultants, ████
████████████████ and any third-party consultant.

2.    Any and all documents relating to, reflecting,
and/or concerning information about public companies.

3.    Any and all evidence reflecting communications
about trading based on information about public companies.

4.    Any and all other evidence that will assist the
FBI in identifying and/or determining whether other individuals
were involved in providing material, nonpublic information in
violation of fiduciary and other duties of confidentiality and/or
involved in trading based on material, nonpublic information.

5.    Any and all other information reflecting and/or
showing and/or leading to evidence, fruits, and/or
instrumentalities of violations of Title 18, United States Code,
Sections 371, 1343, 1348, 1349, 1952, 1956, Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 18, United
States Code, Section 2 in connection with those offenses.

11-21-2010

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION OF        :        **FILED UNDER SEAL**
THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE PREMISES      :
KNOWN AND DESCRIBED AS THE PREMISES                 AFFIDAVIT IN
KNOWN AND DESCRIBED AS (A) THE DESK AND    :        SUPPORT OF A
WORK AREA OF TODD NEWMAN, INCLUDING ALL             SEARCH WARRANT
COMPUTERS, LAPTOPS, HAND-HELD DEVICES,     :
AND CELLULAR TELEPHONES, AND
(B) A MIRROR IMAGE OF DIAMONDBACK          :
CAPITAL MANAGEMENT'S SERVERS WHICH WILL
THEN BE SEARCHED USING A SPECIFIC          :
PROCEDURE, ALL LOCATED AT DIAMONDBACK
CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,     :
15TH FLOOR, STAMFORD, CONNECTICUT
                                           :
- - - - - - - - - - - - - - - - - - - x

    Michael Howard, being duly sworn, deposes and says:

    1.   I am a Special Agent with the Federal Bureau of

Investigation ("FBI"). I make this Affidavit pursuant to Rule 41

of the Federal Rules of Criminal Procedure for the issuance of a

warrant to search THE PREMISES KNOWN AND DESCRIBED AS THE

PREMISES KNOWN AND DESCRIBED AS (A) THE DESK AND WORK AREA OF

TODD NEWMAN, INCLUDING ALL COMPUTERS, LAPTOPS, HAND-HELD DEVICES,

AND CELLULAR TELEPHONES, AND (B) A MIRROR IMAGE OF DIAMONDBACK

CAPITAL MANAGEMENT'S SERVERS WHICH WILL THEN BE SEARCHED USING A

SPECIFIC PROCEDURE, ALL LOCATED AT DIAMONDBACK CAPITAL

MANAGEMENT, 1 LANDMARK SQUARE, 15TH FLOOR, STAMFORD, CONNECTICUT

(the "PREMISES"). The grounds for my belief are as follows.

    2.   I have been a Special Agent with the FBI for

approximately 3 years. I have participated in numerous

investigations of fraudulent schemes, including wire fraud, mail

EXHIBIT A

fraud, money laundering, and securities fraud.  Among other
things, during these investigations, I have participated in the
execution of search warrants.  Through my training, education,
and experience, I have become familiar with the manner in which
fraudulent schemes, including illegal insider trading and wire
fraud schemes, are operated, and the types of electronic records
kept in and maintained in connection with these fraudulent
schemes.

3.     This application is submitted in connection with an
investigation of wire fraud and an illegal insider trading
schemes in which individuals have been receiving and then
transmitting to others material, nonpublic information regarding
certain public companies' quarterly earnings releases and other
market moving events (the "Inside Information") for the purpose
of executing profitable securities transactions, and in which the
Inside Information has been misappropriated by individuals in
violation of their fiduciary and other duties of trust and
confidence to their employers.  For the reasons detailed below,
there is probable cause to believe that, in the PREMISES, there
exists evidence, fruits, and instrumentalities of violations of
the following statutes: (a) wire fraud, in violation of Title 18,
United States Code, Section 1343; (b) money laundering, in
violation of Title 18, United States Code, 1956; (c) travel act,
commercial bribery, in violation of Title 18, United States Code,

2

EXHIBIT A

Section 1952; (d) conspiracy to commit wire fraud, in violation
of Title 18, United States Code, Section 1349; (e) conspiracy to
commit commercial bribery, in violation of Title 18, United
States Code, Section 371; (f) conspiracy to commit money
laundering, in violation of Title 18, United States Code, 371;
(g) securities fraud, in violation of Title 18, United States
Code, Section 1348, and Title 15, United States Code, Sections
78j(b) and 78ff, and Title 17, Code of Federal Regulations,
Sections 240.10b-5 and 240.10b5-2; (h) conspiracy to commit
securities fraud, in violation of Title 18, United States Code,
Section 371, and Title 18, United States Code, Section 1349; and
(i) aiding and abetting the substantive offenses of wire fraud,
money laundering, travel act/commercial bribery, and securities
fraud, in violation of Title 18, United States Code, Section 2
(hereinafter collectively referred to as "TARGET OFFENSES"), as
described below and in Attachments A and B to this Affidavit.

4.    Because this Affidavit is being submitted for the
limited purpose of establishing probable cause for a warrant to
search the PREMISES, I have not included every detail of every
aspect of the investigation.  Rather, I have set forth only those
facts that I believe are necessary to establish probable cause.
The information contained in this Affidavit is based upon
conversations with other law enforcement officers, cooperating
witnesses (as reflected below), my review of various documents

3

EXHIBIT A

and records, my review of interceptions of wire communications as a result of court-authorized wiretaps pursuant to Title 18, United States Code, Section 2518 and, where specified, my personal observations and knowledge.  Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part only.

### THE INVESTIGATION

5.    Since at least in or about 2009, I and other FBI agents have been investigating the TARGET OFFENSES in connection with the use of third-party consultants hired by money managers, including hedge funds, to provide Inside Information relating to public companies.  In certain circumstances, the investigation has focused on third-party consultants like JOHN KINNUCAN who operated his own firm called Broadband Research.  Consultants like KINNUCAN received money from money managers, including hedge funds, for information that they obtained from, among other sources, insiders at public companies.  In other circumstances, the investigation has focused on third-party consultant firms like ████████████████████████ who pay, among other people, insiders at public companies to speak with and provide information to their clients who include hedge funds.

6.    Since at least in or about 2009, I and other FBI agents have determined that there is probable cause to believe that certain third-party consultants, certain third-party consultant

4

EXHIBIT A

firms, certain insiders at public companies, and certain money
managers, among others, have violated the TARGET OFFENSES.
During the course of the investigation, I and other FBI agents
have obtained the cooperation of multiple participants in these
TARGET OFFENSES.  In addition, under the direction of the FBI,
several of these cooperating witnesses have recorded
conversations with participants in these TARGET OFFENSES.
Moreover, I and other FBI agents have obtained court
authorization to intercept wire communications over the
telephones used by multiple individuals.

Cooperation By CW-1

7.    Based on my conversations with other FBI agents, I have
learned that, in or about April 2009, the FBI approached an
individual who was involved in illegal insider trading and wire
fraud schemes.  This individual ("CW-1") agreed to cooperate with
the FBI.  This individual admitted that he was an independent
consultant who, from in or about September 2006 through in or
about March 2009, obtained Inside Information from insiders at
public companies and provided that Inside Information to his
clients at hedge funds in exchange for money.

8.    Based on my conversations with other FBI agents, I have
learned that CW-1, who has not yet been charged with any crimes,
is cooperating with the Government in the hope that CW-1 will be
able to provide substantial assistance to the Government, enter

EXHIBIT A

into a cooperation agreement with the Government, and receive a reduced sentence for CW-1's crimes.  Certain information provided by CW-1 has proven to be reliable and accurate through telephone records, recorded conversations, and other information.

9.   Based on my conversations with other FBI agents, I have learned that one of CW-1's clients was TODD NEWMAN of Diamondback Capital Management.  From in or about 2007 through March 2009, Diamondback Capital Management paid CW-1 for information, including Inside Information, that CW-1 had obtained from insiders at public companies, including the technology companies Marvell and UMC.  NEWMAN knew that CW-1's sources of Inside Information were violating fiduciary and other duties of trust and confidence by providing the Inside Information to CW-1.

10.   Following CW-1's agreement to cooperate, on or about April 14, 2009, at approximately 4:21 p.m., at the direction of an FBI agent, CW-1 placed a call to NEWMAN, which was consensually recorded.  Based on my review of a preliminary transcription of that call, during the call, CW-1 explained that he had been out of contact due to a family emergency, and asked NEWMAN if he needed anything from CW-1.  NEWMAN replied, "Yeah. It's just the usuals.  You know, Broadcom . . . people are expecting some pretty heavy stuff so, everything you know [on] Broadcom, and actually if you can call the ███ guy and the TI." CW-1 stated: "Right. Yeah."  NEWMAN continued.  "And see what

6

EXHIBIT A

he's saying." CW-1 stated: "OK. Was there . . . last time I
think the information directionally, directionally [was] . . .".
NEWMAN interrupted with: "Very good, the UMC guy." (Based on my
conversations with other agents who are familiar with this
investigation, I believe that Broadcom,       and TI, which refers
to Texas Instruments, are all technology companies.) Later in
the call, CW-1 states, "You know, that we had talked about last
time were . . . At least uh the Marvell guy said the unit
numbers were pretty uh, they were kind of, kind of in the ball
park I think, . . .". NEWMAN responded: "Yes." Based on my
conversations with other FBI agents in this investigation, I
learned that this statement corroborates statements CW-1 made to
FBI agents concerning Inside Information CW-1 had provided to
NEWMAN in the past concerning Marvell.

Cooperation By CW-2

    11.  Based on my conversations with other FBI agents, I have
learned that, in or about October 2010, two FBI agents approached
an employee of the hedge fund Level Global Investors ("CW-2")
regarding CW-2's involvement in trading activity based on
material nonpublic information at Level Global Investors, and was
asked to cooperate. By on or about November 2, 2010, CW-2 agreed
to cooperate. CW-2, who has not yet been charged with any
crimes, is cooperating with the Government in the hope that he
can provide substantial assistance, enter into a cooperation

EXHIBIT A

agreement with the Government, and received a reduced sentence for his crimes.  Certain information provided by CW-2 has proven to be reliable and accurate through recorded telephone records, recorded conversations, and other information.

12.  Based on my conversations with other FBI agents who have spoken with CW-2, I have learned, among other things, the following:

a.   CW-2 was an analyst at Level Global Investors and was asked to leave the hedge fund in or about March 2010.

b.   CW-2 worked analyzing and researching public companies in the technology sector.

c.   During his work as an analyst at Level Global Investors, CW-2 obtained Inside Information from insiders at public companies through third-party consultants, including ████ consultants, and from colleagues at other money managers, including hedge funds.  On certain occasions, CW-2 provided this Inside Information to individuals at his hedge fund who executed and caused others to execute certain securities transactions based, in part, on the Inside Information, and that CW-2 informed these individuals at his hedge fund about the sources of the Inside Information.

d.   During his work as an analyst at Level Global Investors, CW-2 exchanged Inside Information with several colleagues at other money managers, including hedge funds.  One

8

EXHIBIT A

of these colleagues was JESSE TORTORA of Diamondback Capital
Management.  CW-2 exchanged the Inside Information with TORTORA
and his other colleagues by and through, among other means, email
communications.  Prior to the arrests of Raj Rajaratnam at
Galleon and other individuals on or about October 16, 2009, CW-2
used his email address at Level Global Investors to exchange
Inside Information with these colleagues.  TORTORA used his email
address at Diamondback Capital Management to exchange Inside
Information with CW-2 and others.  At times, TORTORA sent CW-2
and their colleagues at other money managers emails containing
Inside Information as follows:  TORTORA forwarded the emails that
he had sent to his supervisor, TODD NEWMAN at Diamondback Capital
Management, to CW-2 and their colleagues at other money managers.
Following the arrests on or about October 16, 2009, CW-2,
TORTORA, and certain of their colleagues with whom they exchanged
Inside Information stopped using their work email addresses and
started to use personal email addresses to communicate with each
other.

13.  From on or about October 7, 2009 through on or about
May 27, 2010, I and other FBI agents obtained court authorization
to intercept wire communications over two conference lines used
by ▓▓ to connect, among other things, ▓▓ consultants who
included insiders at public companies with ▓▓ clients who
included hedge funds.  Based on these wire interceptions, I and

9

EXHIBIT A

other FBI agents learned that numerous insiders at public companies were violating their fiduciary and other duties of trust and confidence to their employers by disclosing Inside Information to ▮▮▮s clients.

14.   Based on my review of summary line sheets and my conversations with other FBI agents, I have learned that certain wire interceptions of the ▮▮▮▮ conference lines included conversations between CW-2 and a "consultant" or "expert" who was a company insider at ▮▮▮▮▮▮▮▮▮ in which they discussed inside information, which corroborates CW-2's statements to the FBI that he had obtained Inside Information from insiders at public companies through third-party consultants.  The following is an example of those interceptions:

a.   On or about November 6, 2009, at approximately 11:32 a.m., an incoming call was intercepted on the ▮▮▮ conference lines in which CW-2 and "▮▮▮▮▮▮▮▮▮ were participants.[1]  During the conversation, CW-2 stated that he worked for Level Global Investors, that Level Global Investors has $4 billion in assets and is based in New York, and that CW-2 covers computer hardware and semiconductors.  During the conversation, ▮▮▮▮ stated that he worked for ▮▮▮▮ which is a business unit within ▮▮▮▮▮▮, and that his group was

_____

[1]    Based on my conversations with other FBI agents, I have learned that "▮▮▮" has been identified as ▮▮▮▮▮▮▮

10

involved with all of ███████████ (Based on my review of the wiretap application submitted by the FBI to intercept wire communications over the ███ conference lines (hereinafter "███ Wiretap Application"), I have learned that ███████████ is a public company whose shares are traded on NASDAQ.) ███████ further stated that he has "good visibility" into the semiconductor side of ███████████ (Based on my review of the ███ Wiretap Application, I have learned that the semiconductor side of ███████████ accounts for approximately 50% of the company's overall revenue.) ███████ stated that "from the semiconductor side, I think I have a pretty good idea of what is going on in terms of capital expenditure from the outside world as we see it." CW-2 responded: "Great." ███████ further stated that "... technically my role here is, I am a ███████████, but in order to do what we do for projects that are wide (in) scope across the company, it requires us to have that vision of what is happening in a more global sense." CW-2 responded: "Sure, ok, perfect." CW-2 later stated that he thought that most companies who had reported (earnings) recently think things are going well and that the order guidance was strong for the fourth quarter. CW-2 stated that recently there had been a couple of reports that there was a chance that things could slow and he would be curious to get ███████'s take "if momentum has continued" and how ███████ "sees the slope of the

11

EXHIBIT A

next few quarters." ▮▮▮▮ responded: "Yeah, so hopefully you are hearing that news from our competitors, because I am not seeing it the same way. You know really what I am look at the fourth quarter, of course, our earnings call will be next week, but, um, the fourth quarter from my viewpoint finished up what was a pretty dismal year at least on a positive note, you know. I am looking at about a 75% uptick from the previous quarter, although it was down from the previous year, it was single digits down, right, so 7% below the previous year ... and let me preface what I am about to say with, um, the information, what I look (at) basically are, is, in a sense, kind of a build plan, so it gives me a tick on what we are seeing coming in from our customer base. Um, typically, because it is more manufacturing oriented, the future outlook is somewhat sketchy, I guess would be the best way to put it. Um, so it is not a real, there is not a real scientific forecast that we have. Um, so really what we see comes down to the nuts and bolts of hard orders, um, as we get into real time. So you know, a month away, two months way, pretty good information, pretty much speculative as we go further than that." A short time later, ▮▮▮▮ added that "I am expecting a first quarter uptick of at least 50% on top of the fourth quarter, and then right now the second quarter and the third quarter are somewhat leveling out, and the reason I think that is good news is because, right now, if we can say in the

12

EXHIBIT A

first quarter, in early first quarter, that the second quarter
and the third quarter are leveling out, more than likely, what we
have seen is a lot of that drop in demand come in closer to the
time, and we see the numbers increase." CW-2 responded: "I see."
███████ then stated: "So do I think we are leveling out? I don't
think so. I think the numbers right now mathematically would say
that it is leveling, but I believe the way the momentum is going
right now is that we will see a continual rise, at least probably
through the mid-part of 2010." (Based on my training,
experience, and conversations with other agents, I believe that
the information that ████████ provided to CW-2 would be important
to an investor in determining whether to buy and/or sell ████████
████████ securities, and that the information regarding the
growth of the semiconductor part of the business in the fourth
quarter of this year and the first, second, and third quarters of
next year, was nonpublic at the time.) Later in the
conversation, CW-2 asked: "When do you start to get, um, you
know, very good confidence in the next quarter? At what point?"
████████ responded: "Oh, I would say, you know, I mean obviously
the closer the better, but as we get within a month or so, I
think we have a pretty good idea. We will see some ebbing and
flowing going on for a little while yet, but, like I say, because
we are where we are at, and the numbers that I am seeing for the
second quarter, even the third quarter, is what really makes me

13

EXHIBIT A

feel a little bit more comfortable in saying that those are going
to be some pretty solid quarters for us. No obviously not going
to be at levels we were used to a couple of years ago, but
certainly, you know, reaching levels we were at in mid-2006.
Hold on a sec, I will tell you exactly where that falls in, yeah,
so 2005, mid-to-late 2005, was a bit of a lull, but we are
approaching those levels right now." CW-2 asked: "OK, so you are
approaching levels of 2006 or 2005?" ███████ responded: "2005,
yeah, 2006 really started to shoot up in the second quarter, um,
you know, way up there. We are not there yet." (Based on my
training, experience, and conversations with other agents, I
believe that the information that ██████ provided to CW-2 about
how the "numbers" looked in the fourth quarter as compared with
the numbers in 2005 and 2006 would be important to an investor in
determining whether to buy and/or sell ████████████
securities.) Toward the end of the conversation, ██████ stated:
"As we near the end of the quarter is probably a good time to get
a little bit firmer numbers and see where things are going, but
you know, I leave that up to you, what makes sense to you, so you
just let me know and I can make it happen." CW-2 responded: "OK,
perfect. Well, you know what, maybe I will check in with you
following, well I guess the earnings call is next week, so maybe
it makes sense for us to talk, uh, kind of late November, later

14

EXHIBIT A

in the month, like uh, the last week of November, the first week
of December timeframe." �though responded: "Sure."

Cooperation by CW-3

15.   Based on my conversations with other FBI agents, I have
learned that, in or about October 2010, the FBI approached CW-3
and asked CW-3 to cooperate.  CW-3 has agreed to cooperate.
Among other things, CW-3 admitted that he participated with
others at ████ in obtaining Inside Information from ████
consultants, including insiders at public companies, and that CW-
3 participated in helping ████ clients obtain Inside Information
from ████ consultants.  CW-3, who has not yet been charged with
any crimes yet, is cooperating with the Government in the hope
that he will be able to provide substantial assistance to the
Government, enter into a cooperation agreement with the
Government, and receive a reduced sentence for his crimes.
Certain information provided by CW-3 has proven to be reliable
and accurate through telephone records, recorded conversations,
and other information.

16.   Based on my review of summary line sheets and my
conversations with other FBI agents, I have learned that certain
wire interceptions of the ████ conference lines included
conversations between CW-3 and a "consultant" or "expert" who
previously worked at ████ discussing information to

15

EXHIBIT A

be provided to TORTORA.  The following is an example of those interceptions:

a.   On or about December 1, 2009, at approximately 12:04 p.m., an incoming call was intercepted over the ▇▇▇ conference lines during which a ▇▇▇ employee ("CW-3") spoke with ▇▇▇ who stated that he previously worked at ▇▇▇ and now worked at ▇▇▇.  (Based on my review of the ▇▇▇ Wiretap Application, I have learned that ▇▇▇▇▇▇ is a public company whose shares trade on the New York Stock Exchange, and that ▇▇▇ is a private company that ▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.)  During the conversation, CW-3 stated that he was instructed to speak with ▇▇▇ by "JESSE" [LNU] (who appears to be a ▇▇▇ client named JESSE TORTORA) and that he was interested in learning about ▇▇▇▇▇ and ▇▇▇.  CW-3 mentioned that he knew that ▇▇▇ had spoken with JESSE TORTORA and another individual (whom I believe to be CW-2) in the past and that CW-3 was directed to speak with ▇▇▇.  CW-3 stated that JESSE TORTORA was at a firm whose compliance has grown stronger, so there might have been recent hesitation with JESSE TORTORA reaching out to ▇▇▇.  (Based on my training, experience, and conversations with other agents, I believe that CW-3 was stating that JESSE TORTORA's compliance department did not want JESSE TORTORA speaking directly with employees at public companies and, as a

16

EXHIBIT A

result, JESSE TORTORA directed CW-3 to speak with ███ and then provide the information to JESSE TORTORA, as a means by which JESSE TORTORA would be able to get around the compliance department's policies.) ███ stated that the information he had provided was his read on the industry but nothing confidential and now that ███ was working at a private company, there should be no conflict of interest. CW-3 stated that JESSE TORTORA told CW-3 that ███'s information in the past was a good market indicator even if ███ was not working at the executive level.
███ stated that he left ██████████ because it was a massive company, but ████ was growing and focusing on ██████████ CW-3 asked about ████'s interaction with ██████████ and whether ████ was trying to sell its baseband group. ████ said yes, that ██████████ was trying to sell it, but that no one was willing to pay for it right now so that they pulled it back in-house. ████ further stated that ██████████ and ███████ had a supply agreement for the next ten years. ████ said that ████████ was not buying any big companies. CW-3 asked ████ if ███ still followed what was going on at ██████████, and ████ said that ████████ interacts with some of ██████████ executives and that he hoped to continue that relationship. ████ also stated that ██████████████████████

(Based on my training, experience, and conversations with other

17

EXHIBIT A

agents, I believe that CW-3 was asking whether ▮▮▮▮ had access to
Inside Information at ▮▮▮▮▮▮▮▮▮▮ even though ▮▮▮▮ no
longer worked for that company, and that ▮▮▮▮ stated in his
response that he had access to information as a result of his
company's business relationship with ▮▮▮▮▮▮▮▮▮, his
continued access to executives at ▮▮▮▮▮▮▮▮▮ and ▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ) CW-3 asked about the
next couple of months and quarters in the semiconductor industry,
and ▮▮▮▮ responded that, among other things, it would be until
February until ▮▮▮▮▮▮▮▮▮ can improve its lead times and
that there were supply system issues within ▮▮▮▮▮▮▮▮
that demand was still strong into the end of the first quarter
but who knew afterwards and that, as far as double-booking, it
was not a large concern right now.  (Based on my training,
experience, and conversations with other agents, I believe that
the information that ▮▮▮ provided CW-3 relating to ▮▮▮▮▮
▮▮▮▮▮▮'s would be important to an investor in determining
whether to buy and/or sell ▮▮▮▮▮▮▮▮ securities, and that
the information was not public.)  CW-3 wondered whether ▮▮▮▮
▮▮▮▮▮▮ was on a two-to-three year downturn, and ▮▮▮ stated
that inside management at ▮▮▮▮▮▮▮▮ was short-sighted,
that there was a lot of in-house arguing, and that ▮▮▮▮▮
▮▮▮▮▮▮ had lost share over the last few quarters (according
to an individual named ▮▮▮▮▮▮▮▮▮▮▮▮▮

EXHIBIT A

███████████████████████████████████████████ based on my
review of publicly available information). CW-3 asked if ████
████████████ will have oversupply in the next year, and ████
stated that he thought ██████████████ was still conservative
at least for the next few quarters. CW-3 stated that he wanted
to speak with ████ in another month or two, and will ask about
whether or not "double-booking" will become an issue. CW-3 asked
████ if ████ needed help with anything, and ████ stated that he
was interested in certain areas and if CW-3 heard about any
upcoming mergers and acquisitions. (Based on my training,
experience, and conversations with other agents, I believe that
CW-3 was offering to provide information to ████ about other
companies as a way to obtain further information from ████ about
████████████ in the future.) ████ stated that some "M&A"
(referring to mergers and acquisitions) should happen but he did
not know of any right now. CW-3 stated that he will send any
interesting notes that he has from a contact at ████ and email
them to ████ CW-3 stated that he will let JESSE TORTORA know
that ████ was at a private company now.

Cooperation by CW-4

17.    In or about October 2010, the FBI approached a ████
"consultant" ("CW-4") and asked CW-4 to cooperate. (Based on my
conversations with other FBI agents, I have learned that CW-4 was
one of several global supply managers for Dell during the

19

EXHIBIT A

relevant period.)  CW-4 admitted that CW-4 had violated his fiduciary and other duties of trust and confidence to his employer Dell by providing Inside Information to █████ clients, including Diamondback Capital Management, in exchange for money. CW-4, who has not yet been charged with any crimes, is cooperating with the Government in the hope that he will be able to provide substantial assistance to the Government, enter into a cooperation agreement with the Government, and receive a reduced sentence for his crimes.  Certain information provided by CW-4 has proven to be reliable and accurate through telephone records, recorded conversations, and other information.

18.  Based on my review of summary line sheets and my conversations with other FBI agents, I have learned that certain wire interceptions of the █████ conference lines included conversations between CW-2 and CW-4 regarding the Inside Information.  The following is an example of those interceptions:

a.  On or about January 15, 2010, at approximately 11:36 a.m., an incoming call was intercepted on the █████ conference lines, during which CW-2 spoke with CW-4.  During the conversation, CW-2 stated that he had spoken with "some folks at distributors" who told him that they just had a really hard time getting parts, that "they couldn't get anything and they are all freaked out about it," and that in the last two weeks there was a sudden magical supply.  CW-2 asked whether CW-4 "heard anything

20

EXHIBIT A

like this or does this make sense on what you are seeing?" CW-4
responded: "It does make sense because my supply position right
now and outlook is much better than it was two months ago. Where
I have been living on 1 to 3 days of inventory to my to my
forecast, I am now probably sitting on almost 5 to 6 days, so
things have drastically improved. I think a lot of it is due to
that both WD (Western Digital) and Seagate added some capacity
and we are starting to see the fruitions of that. Now on the
demand side, demand continues to be relatively healthy and
strong. My forecast for December was what I think I told you
like maybe 2.2 or 2.3 (million notebooks) and I finished at 2.1
(million), so you know we take that as a positive." CW-2
replied: "OK." CW-4 continued: "Now January, my forecast is
sitting, I wanted to tell you, I probably told you, like another
2.3 (million). And I am going to land anywhere between 1.9
(million) and 2 (million), that might be down a little bit but
week one of January got off to a slow start. But at the same
time, there is a lot of people off during that time period. So
we are starting to see the hockey stick effect, as far as we get
towards our end of the quarter in January that we are starting to
see a good pickup. So we will probably land in the 1.9 (million)
to 2.0 (million) range. That is off a little bit of the forecast
of 2.3 (million), but we always put in a little bit of hedge in
there to kind of drive more supply." Toward the end of the

21

EXHIBIT A

conversation, CW-4 stated: "Going forward for notebooks, February is at 1.93 (million); March is at 1.97 (million); April is at 2.19 (million); and May is at 1.65 (million)." CW-2 replied: "OK." CW-4 then stated: "With my 2.1 (million) that I did in December, my Q4 ended at 6.1 (million). And if you were to compare that to what Q3 was, my Q3 was at 5.4 (million). And so you know there was some growth there but at the same time, my company continues to lose market share. And I think the IDC, or the data just came out, I guess, yesterday that we showed that we lost market share. Of course, we have always been margin focused over the last nine months and I think that is going to change a little bit, and I think we are going to be going more for revenue and trying to get back some of this market share. So I think that is the strategy from our executives coming out here relatively soon." CW-2 asked: "OK. Do you think that means, you know, taking action on pricing?" CW-4 responded: "I would say yes." CW-4 later explained that companies like Dell, HP, Acer, and especially Apple are moving away from using the "5400" RPM (revolutions per minute) and move toward the "7200" RPM, and that "it's higher margin for us of sales and then also for the hard drive suppliers themselves." CW-2 replied: "Gotcha. Yeah. That definitely is something that should benefit them. I would that both companies will report earnings next week, and I would think that these will be kind of blowout numbers." CW-4 stated, right,

22

EXHIBIT A

yeah, and it will be interesting to see what they say is their outlook.  (Based on my training, experience, and conversations with other agents, I believe that the information that CW-4 provided to CW-2 relating to actual and projected Dell notebook sales would be important to an investor in determining whether to buy and/or sell Dell, Western Digital, and Seagate securities, and that the information was not public at the time.)

19.  Based on my conversations with other agents, I have learned that Diamondback Capital Management is an investment advisor registered with the Securities and Exchange Commission, and is required based on regulations promulgated pursuant to the Investment Advisors Act of 1940 to maintaining certain books and records for a period of not less than five years.  Those records include trading orders and written communications relating to and recommendation or advice given relating to is business.

20.  Based on my review of the Wall Street Journal ("WSJ"), and other media, I have learned that, during the evening hours of November 19, 2010, the WSJ published online, which appeared the next day on the front page of the print edition, entitled "U.S. in Vast Insider Trading Probe."  Among other things, the article stated: "Federal authorities, capping a three-year investigation, are preparing insider-trading charges that could ensnare consultants, investment bankers, hedge-fund and mutual-fund traders and analysts across the nation, according to people

23

EXHIBIT A

familiar with the matter." The article further stated: "One focus of the criminal investigation is examining whether nonpublic information was passed along by independent analysts and consultants who work for companies that provide 'expert network' services to hedge funds and mutual funds. These companies set up meetings and calls with current and former managers from hundreds of companies for traders seeking an investing edge. Among the expert networks whose consultants are being examined, the people say, is Primary Global Research LLC, a Mountain View, Calif., firm that connects experts with investors seeking information in the technology, health-care and other industries."

21.   The November 20, 2010, WSJ article further reported: "John Kinnucan, a principal at Broadband Research LLC in Portland, Ore., sent an email on Oct. 26 to roughly 20 hedge-fund and mutual-fund clients telling of a visit by the Federal Bureau of Investigation: 'Today two fresh faced eager beavers from the FBI showed up unannounced (obviously) on my doorstep thoroughly convinced that my clients have been trading on copious inside information,' the email said. '(They obviously have been recording my cell phone conversations for quite some time, with what motivation I have no idea.) We obviously beg to differ, so have therefore declined the young gentleman's gracious offer to wear a wire and therefore ensnare you in their devious web.'"

24

EXHIBIT A

22.   Based on my conversations with other FBI agents, I have learned that, following publication of the WSJ article on the evening of November 19, 2010, a cooperating witness ("CW-5"), who works at a hedge fund which used ███ consultants, among other people, to obtain Inside Information, informed the FBI that CW-5's supervisor directed him to delete and discard evidence of their participation in illegal insider trading and wire fraud schemes.[2]

23.   Based on my training, experience, conversations with other FBI agents, and knowledge of the actions taken by CW-5's supervisor to discard and destroy evidence for purposes of obstructing the Government's investigation, and because NEWMAN and TORTORA were also in communication with ███ consultants and experts, there is probable cause to believe that this search warrant of the PREMISES is not only necessary to obtain evidence, fruits, and instrumentalities of the TARGET OFFENSES, but to preserve such evidence.

24.   Based on my conversations with other FBI agents, I have learned that, in or about November 2009, the FBI approached another individual who worked at Diamondback Capital.  This

---

[2]    CW-5, who has not yet been charged with any crimes yet, is cooperating with the Government in the hope that CW-5 will be able to provide substantial assistance to the Government, enter into a cooperation agreement with the Government, and receive a reduced sentence for CW-5's crimes.  Certain information provided by CW-5 has proven to be reliable and accurate through telephone records, recorded conversations, and other information.

EXHIBIT A

individual ("CW-6") agreed to cooperate.  CW-6 admitted CW-6's

participation in an illegal insider trading scheme by which CW-6

received Inside Information relating to the acquisition of a

public company and then executed and caused to be executed

securities transactions based on that Inside Information.  CW-6,

who has not yet been charged with any crimes, is cooperating with

the Government in the hope that CW-6 will be able to provide

substantial assistance to the Government, enter into a

cooperation agreement with the Government, and receive a reduced

sentence for CW-6's crimes.  Certain information provided by CW-6

has proven to be reliable and accurate through telephone records,

recorded conversations, and other information.

25.  Based on my conversations with other FBI agents, I have

learned that CW-6, who was most recently inside Diamondback

Capital Management in the fall of 2009, has provided the

following information relating to the office of TODD NEWMAN and

the servers at Diamondback Capital Management as they existed at

that time:

a.  The main office of Diamondback Capital Management

is located on the 15th floor of 1 Landmark Square in Stamford,

Connecticut.  The main reception is on the 15th floor, and the

trading floor is also located on the 15th floor.

b.  NEWMAN works on the trading floor.  To get to

NEWMAN's office, one must pass through the reception area, then

26

EXHIBIT A

turn left, then go through doors, and then enter the trading floor on the left-hand side.  NEWMAN is one of several portfolio managers who have a desk and work area on the trading floor. Portfolio managers like NEWMAN at Diamondback Capital Management typically have multiple computer screens and a desktop computer. Computers of the portfolio managers like NEWMAN at Diamondback Capital Management store electronic data that can be shared with others or, in the alternative, stored solely on the manager's computer.  Portfolio managers also typically have laptop computers which are synced with the office servers.

c.   The servers of Diamondback Capital Management are located on the 15th floor of 1 Landmark Square in Stamford, Connecticut.  To locate the servers, one enters the reception area, makes a right turn, goes to the end of the hall and makes another right turn all the way down to the end of the hall.  In the vicinity of that area, there is a closet that contains the servers of Diamondback Capital Management.  If an item is deleted on someone's computer, the item should remain on the servers. Instant messages are also saved on the servers.

26.  Based on my conversations with other FBI agents who spoke with CW-2, I have learned that TORTORA left Diamondback Capital Management in the last several months.

### ITEMS LIKELY TO BE FOUND AT THE PREMISES

27

## EXHIBIT A

27.   Based upon my training, experience and participation in investigations of fraudulent schemes, particularly schemes relating to illegal insider trading and wire fraud, as well as my conversations with other FBI agents, I know the following:

a.   Participants in fraudulent schemes, including insider trading and wire fraud schemes, frequently maintain documents in paper and electronic form that reflect their communications relating to Inside Information, their communications relating to trades executed based in part on Inside Information, notes reflecting the receipt of Inside Information, the location of fraudulent proceeds, the transfers of money and other proceeds of the schemes, and other evidence of the fraudulent schemes.   In particular, based on the information provided above, I believe that PREMISES will contain emails, notes, and financial records that would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

b.   Participants in fraudulent schemes, including insider trading and wire fraud schemes, also commonly maintain addresses and telephone numbers in books and papers in both electronic and paper form which reflect names, addresses, telephone numbers and/or paging numbers for their associates in the schemes.   Based on the information provided above, I believe that the PREMISES will contain telephone and address books and other documents reflecting names and numbers in both paper and

28

EXHIBIT A

electronic form and that such items would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

c.   Participants in fraudulent schemes, including insider trading and wire fraud schemes, often use computers and other electronic devices, including hand-held devices, for the storage of documents and to send and/or receive email communications.  Based on the information above, I believe that the computers and other electronic devices, including hand-held devices, on the PREMISES are items that would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.  I further believe that the servers on the PREMISES would contain evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

d.   Participants in fraudulent schemes, including insider trading and wire fraud schemes, often use cellular telephones to store contact information of other participants and to send and receive text messages in furtherance of the schemes. Based on the information above, I believe that cellular telephones on the PREMISES are items that would constitute evidence, fruits, and/or instrumentalities of the TARGET OFFENSES.

28.  Based on my training, experience, conversations with other FBI agents, review of wire interceptions, and conversations with cooperating witnesses who have participated in illegal

29

EXHIBIT A

insider trading and wire fraud schemes, I am familiar with the
practices and methods of persons committing the TARGET OFFENSES,
and the means by which such persons communicate with each other
and maintain documents and records in paper and electronic form.
In addition, based on my conversations with other FBI agents, I
know that there is probable cause to believe that the PREMISES
contains certain electronic data relating to the TARGET OFFENSES.

29.   Based on the foregoing, I believe that there is
probable cause to believe that the documents, records, computers,
hand-held devices, servers, and cellular telephones on the
PREMISES constitute evidence, fruits, and instrumentalities of
the commission of violations of federal laws, including the
TARGET OFFENSES.

### REQUEST FOR SEALING

30.   Since this criminal investigation is non-public and
ongoing, disclosure of the search warrant, this affidavit, and/or
this application and the attachments thereto will seriously
jeopardize the progress of the investigation.  Accordingly, I
request that the Court issue an order that the search warrant,
this affidavit in support of application for the search warrant,
the application for the search warrant, and any attachment
thereto be filed under seal until further order of this Court.

EXHIBIT A

## SEARCH PROCEDURE

31.  In order to ensure that agents search only the PREMISES, the search warrant will search for and seize from Diamondback Capital Management the items on the PREMISES as described in Attachment A, and the FBI will conduct a search of the servers on the PREMISES and the other items on the PREMISES in accordance with the procedure and use of search terms set forth in Attachment B.



MH

## CONCLUSION

WHEREFORE, I respectfully request that a search warrant issue, pursuant to Rule 41 of the Federal Rules of Criminal

31

EXHIBIT A

Procedure, to search the PREMISES for the items and information set forth in Attachment A, and following the procedure described in Attachment B, all of which constitute evidence, fruits, and instrumentalities of violations of the TARGET OFFENSES.

Dated:      November 21, 2010

_____

MICHAEL HOWARD
Special Agent
Federal Bureau of Investigation

SO ORDERED:

s/Holly B. Fitzsimmons

HONORABLE HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE
DISTRICT OF CONNECTICUT

32

EXHIBIT A

ATTACHMENT A
(page 1 of 2)

THE PREMISES KNOWN AND DESCRIBED AS
(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR TELEPHONES,
AND
(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S SERVERS
WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE, ALL
LOCATED AT DIAMONDBACK CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,
15TH FLOOR, STAMFORD, CONNECTICUT

(A) THE DESK AND WORK AREA OF TODD NEWMAN, INCLUDING

ALL COMPUTERS, LAPTOPS, HAND-HELD DEVICES, AND CELLULAR

TELEPHONES: All financial records, handwritten documents and/or

notebooks, letters and correspondence, photographs, telephone and

address books, identification documents, travel documents,

telephone records, computers and other electronic devices,

cellular telephones, and other records and documents that

constitute evidence of the commission of securities fraud, wire

fraud, money laundering, commercial bribery, conspiracy to commit

and aiding and abetting the commission of such crimes, or are

contraband and/or the fruits of violations of the federal

securities fraud, wire fraud, money laundering, and commercial

bribery laws, and/or are designed or intended as a means of

violating the federal securities fraud, wire fraud, money

laundering, and commercial bribery laws, including any of the

above items that are maintained within other closed or locked

containers, including those that may be further secured by key

locks (or combination locks) of various kinds.  These items will

be searched pursuant to the procedure set forth in Attachment B.

EXHIBIT A

ATTACHMENT A
(page 2 of 2)

(B) A MIRROR IMAGE OF DIAMONDBACK CAPITAL MANAGEMENT'S
SERVERS WHICH WILL THEN BE SEARCHED USING A SPECIFIC PROCEDURE
SET FORTH IN ATTACHMENT B.

EXHIBIT A

ATTACHMENT B
(page 1 of 2)

1.    The Federal Bureau of Investigation ("FBI") will follow
the following procedure with respect to the search of the servers
listed in Attachment A at Diamondback Capital Management.

First, personnel at the FBI will make a mirror image of
all, or as much as feasible and necessary, of the servers at
Diamondback Capital Management.

Second, if Diamondback Capital Management volunteers to
make a mirror image of the servers and (if and only if) the FBI
determines that their assistance is necessary and proper, the FBI
will supervise the process by which all, or as much as feasible
and necessary, of the servers at Diamondback Capital Management
will be imaged.

Third, following completion of the imaging process, the
FBI will designate one or more personnel who will be walled off
from the investigation to conduct the following searches of the
imaged material from the servers:

(1) Search for all emails and documents authored
by, sent to, and/or received from Todd Newman and Jesse Tortora.

(2) Search for all emails and documents with the
following search terms:



(a)
(b)
(c) "my check"
(d) consultant
(e)
(f)
(g) Dell
(h)
(i)

EXHIBIT A

ATTACHMENT B
(page 2 of 2)

2.    For all other items listed in Attachment A (other than
the servers which is covered by procedure #1 above), the FBI will
search the content in Attachment A for the following information:

1.    Any and all communications between and among Todd
Newman, Jesse Tortora, Sam Adondakis, ████ consultants, ████
and any third-party consultant.

2.    Any and all documents relating to, reflecting,
and/or concerning information about public companies.

3.    Any and all evidence reflecting communications
about trading based on information about public companies.

4.    Any and all other evidence that will assist the
FBI in identifying and/or determining whether other individuals
were involved in providing material, nonpublic information in
violation of fiduciary and other duties of confidentiality and/or
involved in trading based on material, nonpublic information.

5.    Any and all other information reflecting and/or
showing and/or leading to evidence, fruits, and/or
instrumentalities of violations of Title 18, United States Code,
Sections 371, 1343, 1348, 1349, 1952, 1956, Title 15, United
States Code, Sections 78j(b) and 78ff, and Title 18, United
States Code, Section 2 in connection with those offenses.

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION OF      :     MOTION TO SEAL
THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE PREMISES    :     MISC. NO.
KNOWN AND DESCRIBED AS THE PREMISES
KNOWN AND DESCRIBED AS (A) THE DESK AND  :
WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES,   :
AND CELLULAR TELEPHONES, AND
(B) A MIRROR IMAGE OF DIAMONDBACK        :
CAPITAL MANAGEMENT'S SERVERS WHICH WILL
THEN BE SEARCHED USING A SPECIFIC        :     November 21, 2010
PROCEDURE, ALL LOCATED AT DIAMONDBACK
CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,   :
15TH FLOOR, STAMFORD, CONNECTICUT
                                         :
- - - - - - - - - - - - - - - - - - - - x

       The United States of America, by Nora Dannehy, Assistant

United States Attorney, moves this Honorable Court for an Order

sealing the search warrant application and affidavit, to include

attachments A and B, this Motion to Seal, and the proposed Order to

Seal in the above-captioned matter.

       The United States requests sealing because disclosure of the

information contained in the Search Warrant Application and

Affidavit will jeopardize an ongoing grand jury investigation.  In

addition, the affidavit includes information about a number of

related investigations and disclosure of that information may

similarly impede those investigations.  Finally, the business

employs individuals who are not part of this investigation and

public filing of the affidavit, as it relates to an ongoing

EXHIBIT A

business, may unnecessarily subject innocent employees to unfair
publicity.

Respectfully submitted,

DAVID B. FEIN
UNITED STATES ATTORNEY

NORA DANNEHY
ASSISTANT UNITED STATES ATTORNEY

2

EXHIBIT A

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT
- - - - - - - - - - - - - - - - - - x

IN THE MATTER OF THE APPLICATION OF      :      ORDER TO SEAL
THE UNITED STATES OF AMERICA
FOR A SEARCH WARRANT FOR THE PREMISES    :      MISC NO. __
KNOWN AND DESCRIBED AS THE PREMISES
KNOWN AND DESCRIBED AS (A) THE DESK AND  :
WORK AREA OF TODD NEWMAN, INCLUDING ALL
COMPUTERS, LAPTOPS, HAND-HELD DEVICES,   :
AND CELLULAR TELEPHONES, AND
(B) A MIRROR IMAGE OF DIAMONDBACK        :      November 21, 2010
CAPITAL MANAGEMENT'S SERVERS WHICH WILL
THEN BE SEARCHED USING A SPECIFIC        :
PROCEDURE, ALL LOCATED AT DIAMONDBACK
CAPITAL MANAGEMENT, 1 LANDMARK SQUARE,   :
15TH FLOOR, STAMFORD, CONNECTICUT
                                         :
- - - - - - - - - - - - - - - - - - x

UPON CONSIDERATION of the Government's Motion to Seal, the Court finds that sealing of the search warrant application and attachments, as well as the affidavit is necessary to prevent the disclosure of grand jury material in violation of Fed.R.Cr.P.6(e). The Court finds that this is an ongoing investigation and the affidavit in support of the search warrant contains detailed information about the investigation, to include information obtained pursuant to grand jury subpoenas. In addition, the affidavit includes information about a number of related investigations and disclosure of that information may similarly impede those investigations. Finally, the Court finds that the requested warrant to search relates to an ongoing business that employs individuals who are not the focus of the investigation and that public filing of the affidavit and application may subject the

EXHIBIT A

employees to unfair publicity at this time.  The Court, therefore,

orders that: the search warrant application, affidavit, Motion to

Seal and this Order to Seal be filed under seal until further order

of the Court.

SO ORDERED.
November 21, 2010                    s/Holly B. Fitzsimmons
                             _____
                             HOLLY B. FITZSIMMONS
                             UNITED STATES MAGISTRATE JUDGE

2

EXHIBIT A